## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 07-22988-CIV-GOLDBERG/TORRES

BUCKLEY TOWERS CONDOMINIUM,
INC.,

      Plaintiff,

v.

QBE INSURANCE CORPORATION,

      Defendant.

_____/

## REPORT AND RECOMMENDATION ON ATTORNEYS' CHARGING LIENS AND RELATED MATTERS

This matter is before the Court on several post-judgment motions filed by Plaintiff's prior counsel to determine and enforce charging liens for professional services they rendered. Specifically, Becker & Poliakoff, P.A., Rosenbaum Mollengard Janssen & Siracusa, PLLC and Katzman Garfinkel & Rosenbaum LLP each move to enforce their respective charging liens. [D.E. 508, 525; 537; 569]. The Court has reviewed the motions, responses, replies, the parties' supplemental filings, intervener filings, the exhibits filed with the Court and is otherwise completely appraised of the entire record in this case. The Court also held a hearing on May 10, 2011, at which the parties presented arguments on these pending motions. After thoroughly reviewing the motions and arguments contained therein, the Court recommends that the motions be granted and denied in part as more fully explained below.[1]

---

[1]     The Honorable Richard W. Goldberg referred all post trial motions to the undersigned for disposition. [D.E. 549].

## I.  BACKGROUND

On October 24, 2005, Hurricane Wilma struck Plaintiff Buckley Towers ("Buckley") and caused significant damage to the property. Consequently, Buckley reported its claim to its insurer Defendant QBE Insurance ("QBE"), which failed to adjust the claim and provide any payments pursuant to the insurance contract.

On October 27, 2007, Buckley retained Becker & Poliakoff, P.A. ("B&P"), which had been handling its condominium association matters, to litigate against QBE.  B&P filed suit against QBE on November 16, 2007. [D.E. 1].  Initially, Buckley paid B&P on an hourly basis.  Later, on April 17, 2008, Buckley and B&P entered into a contingency fee agreement that obligated Buckley to pay B&P forty percent (40%) of the gross proceeds of any recovery, including attorneys' fees. [D.E. 508-1].  Throughout its employment, B&P continually represented Buckley with a team of attorneys led by Daniel S. Rosenbaum ("Rosenbaum"), an equity shareholder of B&P.  However, on August 4, 2008, Rosenbaum terminated his relationship with B&P and joined a new firm.  Thereafter, Buckley discharged B&P as counsel of record; in total, B&P handled less than four months of pre-trial matters on contingency. [D.E. 508 at 3].

Contemporaneously, Buckley retained Rosenbaum and his new firm Katzman, Garfinkel & Rosenbaum, LLP ("KGR").  On August 20, 2008, the Court entered an order substituting KGR as counsel of record. [D.E. 216].  On August 26, 2008, Buckley entered into another (substantially similar) contingency fee agreement with KGR.  The only material difference is the contingency was reduced to 38.5% of any recovery. [D.E. 542 at ¶6].  The next day, B&P filed a notice of charging lien. [D.E. 223].

As counsel of record, KGR completed pre-trial matters and litigated the case to verdict after a ten day jury trial. On February 13, 2009, the jury found in favor of Buckley on all counts and awarded Buckley $18,708,608 for replacement cost damages and $1,607,000 for law and ordinance coverage. [D.E. 340]. After application of the hurricane deductible, Buckley's award totaled $19,379,431. On May 14, 2009, with interest and other matters, the verdict was reduced to an amended final judgment in the amount of $24,986,750.87. [D.E. 431]. On June 24, 2009, QBE filed its notice of appeal. [D.E. 444]. KGR remained counsel of record through briefing on the appeal.

However, in March 2010, Rosenbaum again severed his relationship with his firm and started his own firm: Rosenbaum, Mollengarden, Janssen & Siracusa, PLLC ("RMJS"). [D.E. 542 at ¶12; D.E. 570 at 4].[2] Buckley likewise terminated KGR and then retained Rosenbaum and his new firm.[3] [D.E. 542 at ¶12; D.E 560 at 3].[4] On April 1, 2010, RMJS's attorneys filed notices of appearance on behalf of Buckley. [D.E. 479-482]. On April 12, 2010, Buckley executed a third contingency fee agreement wherein

---

[2]    On March 19, 2010, KGR's two remaining partners sued KGR for dissolution, styled *Katzman, Garfinkel v. Katzman, Garfinkel & Rosenbaum, LLP*, 50-2010-CA-007791-XXMB, in the Circuit Court for the 15th Judicial Court in Palm Beach County, Florida.

[3]    Specifically, the contingency fee agreement Buckley and RMJS executed on April 12, 2010 contained a clause indicating that Buckley retroactively retained RMJS as of April 1, 2010. [D.E. 535-2].

[4]    KGR filed its charging lien on April 8, 2011. [D.E. 518].

Buckley agreed to pay RMJS 38.5% of the gross recovery.[5] [D.E. 562-1].  At the time Buckley retained RMJS, only oral argument on the appeal remained.

On December 10, 2010, the Court of Appeals affirmed in part and vacated in part. *Buckley Towers Condo. Ass'n, Inc. v. QBE Ins. Corp.,* 395 F. App'x 659 (11th Cir. 2010). [D.E. 488].  Specifically, the Eleventh Circuit reversed that portion of the final judgment attributed to: 1) replacement cost value; 2) law and ordinance damages, and 3) prejudgment interest, but affirmed the actual cost value damages of $11,395,665. The remainder of the appeal remains pending until the Florida Supreme Court resolves the two certified questions from *Chalfonte Condominium Apartments Ass'n, Inc. v. QBE Ins. Corp.*, 561 F.3d 1267, 1274-75 (11th Cir. 2009).

On March 2, 2011, although part of the appeal was still pending, Buckley moved for entry of partial amended final judgment. [D.E. 498].  Buckley requested a Rule 54(b) judgment because it risked "having its buildings demolished as unsafe by Miami-Dade County" and needed the money "to save its buildings and the homes of its residents." *Id.* at 2,4. (emphasis omitted).   Buckley presented a dire set of circumstances and stressed the immediate need for an award despite the pending appeal. *Id.* at 2-3.

The Court granted this request and entered the March 28, 2011 Partial Amended Final Judgment in the total amount of $12,035,449.00, consisting of: 1)

---

[5]      That contingency fee agreement defines "gross recovery" as the "gross recovery of any settlement, trial verdict, final judgment, court order, appeal or other disposition of the case, including interest, any attorneys' fees and cost awards." *Id.* at 6.

Buckley's actual cost value of $11,395,665.00; and 2) attorneys' fees of $1,575,961.00; 3) less the hurricane deductible of $936,177.00. [D.E. 506].[6]  Notably, the Court specifically reserved jurisdiction to "enter further partial or amended final judgements and orders as needed for all additional unresolved issues." *Id.* at 3.

The partial amended final judgment, which directed QBE to pay Buckley, triggered filings by B&P, KGR and RMJS regarding attorneys' fees and how the Court should divide them.  Because their motions implicated only a portion of the total judgment, the parties' filed an April 11, 2011 joint motion to place the disputed funds – $6,148,128.40 – into the Court Registry [D.E. 520], which the Court granted that day. [D.E. 522].  On April 21, 2011, QBE issued two checks, one jointly made out to RMJS and Buckley in the amount of $5,921,367.67 and another to the Court Registry for the remaining $6,148,128.40. [D.E. 537-1].  However, before Buckley endorsed the joint RMJS/Buckley check, Buckley terminated RMJS and retained its current counsel Katzman, Garfinkel & Berger. [D.E. 535-1].  Later that day, RMJS filed its April 29, 2011 charging lien. [D.E. 535].

The issue now, pursuant to the pending equitable liens, is determining how much money B&P, KGR and RMJS should receive in attorneys' fees.  After substantial preliminary briefing, the Court held a hearing on May 11, 2011 and then, after

---

[6]      The Court granted Buckley's renewed motion for attorneys' fees in part, as prevailing party in the action, for the total amount of $1,575,961.00, pursuant to Fla. Stat. § 627.428. [D.E. 458; D.E. 476].

entertaining their arguments, directed the parties to file supplemental memoranda/closing arguments.  A brief summary of their arguments follow.

B&P.  Buckley's original law firm, which briefly handled pretrial matters on a contingency basis, advances three arguments for allocating the attorneys' fees, in decreasing preference.  First is a "contract approach" by which B&P is awarded quantum meruit *plus* 50% of the total contingency fee based on its contractual agreements with Rosenbaum.[7]  Alternatively, the Court should treat the contingency fee award as an asset of B&P and apply a *Frates* analysis awarding B&P its full contingency less the combination of RMJS's quantum meruit and Rosenbaum's shareholder percentage had he remained a B&P partner.  *See Frates v. Nichols*, 140 So. 2d 321 (Fla. 3d DCA 1962).  Lastly, if the Court rejects those two approaches, B&P asserts that the Court should apply a *Poletz* modified quantum meruit analysis and award B&P an appropriate amount that considers the totality of the circumstances. *See Searcy, Denney, Scarola, Barnhart & Shipley, P.A. v. Poletz*, 652 So. 2d 366 (Fla. 1995).[8]

---

[7]      B&P refers to its Stockholder's Agreement, which states, in pertinent part, "[in the event a stockholder leaves the firm, the] stockholder acknowledges that should he (she) continue working on such a file [after leaving], that he (she) shall do so on behalf of and in the interest of [B&P], and shall compensate to [B&P] the greater of fifty percent (50%) of any fee received from said client, or the firm's quantum meruit. [D.E. 525-2 at 15].  The Shareholders' and Employment and Deferred Compensation Agreements contain similar provisions. [D.E. 525-3 at 10; D.E. 525-4 at 11].

[8]      Regardless of the approach, B&P specifically requests a period of discovery to develop, and an evidentiary hearing to present, its various approaches for calculating its attorneys' fees. [D.E. 508; D.E. 525].

Buckley and the competing prior counsel reject B&P's contentions, raise various defenses why those approaches are inappropriate and argue that the Court should decline to exercise its supplemental jurisdiction. Alternatively, these parties argue that, if the Court exercises its supplemental jurisdiction, B&P is entitled to its quantum meruit award only. Notably, B&P interjects numerous issues of Florida state law and even concedes that resolving this dispute under its suggested methods will likely require a jury trial. [D.E. 557 at 2 n.2].

KGR. Buckley's second law firm, which handled on contingency some pre-trial matters, the jury trial and briefing on the appeal, initially argues that the Court should decline supplemental jurisdiction over the charging liens and refer this matter to Judge David French, the Florida state judge presiding over the KGR dissolution action. Alternatively, and recognizing that B&P is not a party to the state action, that the Court should equitably resolve B&P's charging lien only. Under this alternative approach, KGR contends that the Court should decline to resolve KGR and RMJS's charging liens because they implicate various aspects of state law, part of which are currently being litigated in state court, and because the cumulative effort in doing so would needlessly waste significant judicial resources. [D.E. 542].

After the May 10, 2011 hearing, KGR filed a supplemental memorandum arguing that, if the Court decides to exercise its supplemental jurisdiction, KGR properly perfected its charging lien, that the continency occurred while it was counsel of record and thus it is entitled to the full contingency fee award. Alternatively still, KGR asserts that if the Court deems that its charging lien was not perfected then it is

7

entitled to an award of attorneys' fees under a contract analysis based on its quantum meruit *plus* 70% of the continency fee award.[9]  Or, as a third alternative, that KGR is entitled to quantum meruit under a *Poletz* analysis.

Like B&P, KGR specifically requests a hearing to examine "the evidence with regard to the respective contributions of the various law firms as counsel for Buckley" so that KGR may establish that it "prepared the case for trial, tried the case, and obtained the jury verdict ultimately leading to payment in excess of $12,000,000" and thus "KGR provided the lion's share of benefit to [Buckley]."  [D.E. 560; D.E. 569 at 4].  Additionally, KGR requests an opportunity to rebut RMJS's contention that KGR was terminated for cause due to its dissolution generally, and its inability to continue representing Buckley, specifically. [D.E. 570].

RMJS.  Buckley's third law firm, which handled part of the appeal *only*, argues that it is entitled to the full contingency – over $4.6 Million – because it was counsel of record when the contingency occurred.  And this holds true regardless of whether it was terminated with or without cause, which Buckley disputes.  As for B&P, RMJS asserts that the Court should decline to exercise its supplemental jurisdiction to resolve its various Florida state law issues presented and award it *Poletz* quantum meruit only.  As for KGR, RMJS contends that its charging lien is untimely and, therefore, KGR is without a remedy in this preceding.  Alternatively, if the Court finds

---

[9]     Like B&P, KGR refers to an agreement in which Mr. Rosenbaum agreed to remit 70% of the total fee earned on any case it acquired during the partnership but resolved subsequent to his separation. [D.E. 542-1 at 6].

KGR's charging lien is proper, RMJS first asserts that the Court should still decline to exercise its supplemental jurisdiction, but if it does not, the Court should limit KGR to its quantum meruit *reduced* by an accounting of the damage caused before its "for-cause" termination.[10]

Consequently, RMJS maintains that the quantum meruit awards to B&P and KGR – the only relief RMJS concedes they are entitled to – are payable by Buckley *in addition* to RMJS's full contingency fee award.  That is, after paying the over $4.6 million contingency fee award to RMJS, Buckley must also bear the additional burden of paying B&P and KGR from its award, which – according to B&P and KGR – could equal millions of dollars.

<u>Buckley</u>.  Buckley argues that any award of attorneys' fees allocated to B&P, KGR and RMJS should be limited to a maximum ceiling of 40% of the judgement – the contingency fee percentage agreed to in its original agreement with B&P. [D.E. 561-1 at 5].  To the extent the Court awards a combination of attorneys' fees to B&P, KGR and RMJS, Buckley contends that these law firms should split that maximum ceiling based on a quantum meruit formula.  In fact, Buckley takes a more broad strokes approach contending simply that all three firms were "discharged" before the Court entered a final "final judgment" and, therefore, the best (and most equitable) approach to resolving these charging liens is by applying a quantum meruit analysis across the board.  And, while doing so, the Court should account for the various factors relevant

---

[10]     KGR, of course, disputes that it was terminated by Buckley for cause. And Buckley echos KGR's disagreement.  [D.E. 574 at 4].

to the contributions of each law firm, such as their time, efforts and results.  Buckley also contends that the Court should consider that RMJS was terminated for cause and reduce its award accordingly. [D.E. 561-1 at 7].

## II.  ANALYSIS

### A.   *Supplemental Jurisdiction*

Federal subject matter jurisdiction for this insurance dispute between Buckley, a Florida corporation, and QBE, a Delaware corporation, was based on diversity of citizenship.  With respect to the pending charging liens, each law firm is a Florida corporation with their various, divergent claims for attorneys' fees arising from Florida state law.  Thus, without an independent basis for federal jurisdiction, the Court must exercise its discretionary supplemental jurisdiction to adjudicate these claims.  Pursuant to 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy... ."  The exercise of jurisdiction is vested in the sound discretion of the trial court.

28 U.S.C. § 1367(c) provides that the district courts may decline to exercise supplemental jurisdiction over a claim if: (1) the claim raises a novel or complex issue of State law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or, (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

10

"Ancillary jurisdiction rests on the premise that a federal court acquires jurisdiction of a case or controversy in its entirety.  Incident to the disposition of the principal issues before it, a court may decide collateral matters necessary to render complete justice." *Jenkins v. Weinshienk,* 670 F.2d 915, 918 (10th Cir. 1982).   In *Morrow v. District of Columbia,* 417 F.2d 728, 740 (D.C. Cir. 1969), the court identified a number of factors to be considered in deciding whether to exercise ancillary jurisdiction: (1) an ancillary matter should arise from the transaction that was the basis of the principal proceeding, during the course of the principal proceeding, or as an integral part of the main proceeding; (2) the federal court should be able to determine the matter without a substantial new fact finding proceeding; (3) failing to determine the matter should not deprive a party of an important procedural or substantive right; or (4) the matter should be decided in order to protect the integrity of the principal proceeding or insure that its disposition is not frustrated. *See also Jenkins*, 670 F.2d at 918; *Trianon Condo. Apartments Ass'n, Inc. v. QBE Ins. Corp.*, No. 10-80812, 2011 WL 664317, at *2 (S.D. Fla. Feb. 23, 2011).

Federal courts have often exercised jurisdiction over claims for attorneys' fees, since "[d]etermining the legal fees a party to a lawsuit properly before the court owes its attorney, with respect to work done in the case being litigated, easily fits the concept of ancillary jurisdiction." *Jenkins,* 670 F.2d at 918; *see also Rivera-Domenech v. Calvesbert Law Offices PSC,* 402 F.3d 246, 250 (1st Cir. 2005); *State of Iowa v. Union Asphalt and Roadoils, Inc.,* 409 F.2d 1239, 1243-44 (8th Cir. 1969); *Nat'l Equip. Rental,*

11

*Ltd. v. Mercury Typesetting Co.,* 323 F.2d 784, 786 (2d Cir. 1963). However, courts also may exercise their discretion to decline jurisdiction in fee matters, *Jenkins,* 670 F.2d at 919; *Pay Television of Greater New York v. Sheridan,* 766 F.2d 92, 94-96 (2d Cir. 1985); *Moore v. Teflon Commc'n Corp.,* 589 F.2d 959, 967 (9th Cir. 1978); *Doggett v. Deauville Corp.,* 148 F.2d 881, 883 (5th Cir. 1945), especially when presented with numerous tangential state law issues. *See, e.g, Trianon,* 2011 WL 664317, at *2.

As noted, prior counsel advance a range of arguments to support their positions that this Court should exercise its supplemental jurisdiction to adjudicate all, none or a combination of the issues purportedly implicated by their charging liens. Importantly, however, many of these issues are unique to the relationships between counsel, rather than their services provided to Buckley. Moreover, questions of state law involving contract, tort and corporate law are pervasive components of those issues and thus beyond the customary scope of determining the fees a client owes its attorney. And, not only are those state law matters tangential to the underlying litigation – an insurance coverage dispute over hurricane damage – resolving them will likely require additional discovery and an evidentiary hearing. In fact, at least one party has acknowledged that the Court would likely be required to hold a separate jury trial to resolve these specific state law issues. Altogether, these factors counsel against fully exercising our supplemental jurisdiction. *See Morrow*, 417 F.2d at 740; *see also Jenkins*, 670 F.2d at 918; *Hogben v. Wyndham Int'l, Inc*., No. 05-20944-Civ, 2007 WL 2225970 (S.D. Fla. Aug. 1, 2007).

That being said, the Court finds it appropriate to exercise its supplemental jurisdiction to resolve the parties' charging liens under equitable principles, based strictly on Florida charging lien law.  This logically falls within the Court's recognized ancillary jurisdiction to adjudicate attorneys' fees disputes relating to fees the *client* owes *its attorneys* for the services provided to the client. *See, e.g., Gottlieb v. GC Fin. Corp.,* 97 F. Supp. 2d 1310 (S.D. Fla. 1999) and *Zaklama v. Mount Sinai Med. Ctr.*, 906 F.2d 650 (11th Cir. 1990) (both adjudicating post-judgment attorneys' fees disputes under Florida charging lien law).  Echoing *Jenkins*, "[d]etermining the legal fees *a party* to a lawsuit properly before the court *owes its attorney*, with respect to work done in the case being litigated, easily fits the concept of ancillary jurisdiction,"  670 F.2d at 918, and thus the Court will go that far, but no further.  The three law firms (and Buckley) are free to pursue any other legal claims or remedies that may exist between them in state court.

### B.   *Charging Lien Law*

"Federal courts, although they recognize no common-law lien in favor of attorneys, give effect to the laws of the states in which they are held." *Gottlieb*, 97 F. Supp. 2d at 1311 (citing *Webster v. Sweat,* 65 F.2d 109, 110 (5th Cir. 1933)); *accord Zaklama*, 906 F.2d 650 (11th Cir. 1990) (the rights and obligations of parties to a contract that provides for attorneys' fees upon the happening of a contingency are governed by state law).  Under Florida's common law, a charging lien may be utilized to enforce the equitable right of attorneys to have costs and fees owed for legal services

secured by the judgment or recovery in a lawsuit. *See Sinclair, Louis, Siegel, Heath, Nussbaum & Zavertnik, P.A. v. Baucom,* 428 So. 2d 1383, 1384 (Fla. 1983); *Flynn v. Sarasota Cnty. Pub. Hosp. Bd.,* 169 F. Supp. 2d 1363, 1368 (M.D. Fla. 2001). "No statutes outline the requirements for valid attorney's liens in Florida. Rather case law acts as the sole guide for both attorneys and courts as to these liens." *Daniel Mones, P.A. v. Smith, Inc.,* 486 So. 2d 559, 561 (Fla. 1986).

Before resolving the ultimate issue, the Court must first determine two preliminary matters: 1) whether prior counsel properly perfected their respective charging liens and 2) when the contingency occurred relative to their representation of Buckley.

### 1.   *All Three Charging Liens are Valid.*

All proceedings in Florida to resolve an attorney's charging lien for legal services are *equitable in nature. See Nichols v. Kroelinger,* 46 So. 2d 722 (Fla.1950) (emphasis added). Thus equitable defenses to an action in equity, such as unclean hands or the adequacy of a remedy at law, may be asserted in a charging lien case. *E.g., Scutieri v. Estate of Philip Revitz,* 829 F. Supp. 387, 392 (S.D. Fla. 1993). And, to impose a charging lien, a court in equity must find: (1) an express or implied contract between the attorney and client; (2) an express or implied understanding that payment is either contingent upon recovery or will be paid from the recovery; (3) an attempt by the client to avoid paying or a dispute as to the amount of the fee; and (4) a timely notice of a request for a lien. *E.g., Sinclair,* 428 So.2d at 1385; *Gottlieb,* 97 F. Supp. 2d at 1311.

14

Thus, as a preliminary matter, the first inquiry is whether prior counsel properly perfected their charging liens.

There is no question that B&P and RMJS meet each prong of this test. [D.E. 223; D.E. 535]. RMJS asserts, however, that KGR's charging lien is untimely. Buckley terminated KGR on or before March 31, 2010, but KGR waited until April 8, 2011 to file its charging lien. [D.E. 518]. RMJS contends that because KGR filed its charging lien more than a year after its termination *and* after the Court entered the March 28, 2011 partial amended final judgment that KGR "is foreclosed from having its claims heard by this Court." [D.E. 562 at 11]. KGR disagrees, and so do we.

Relying on *Scutieri*, RMJS suggests that KGR's charging lien is untimely because KGR failed to file the lien contemporaneously with its termination. 829 F. Supp. at 392; [D.E. 562 at 12]. However, the contemporaneousness of filing a charging lien is not the dispositive factor for timeliness. Indeed, *Scutieri* merely distinguishes, from a factual standpoint, that the charging lien in question was filed *two years* after the case was dismissed while the other, valid charging lien was filed *contemporaneously* with the attorney's termination. *Id.* As RMJS generally concedes, *Scutieri* more accurately explains timeliness as follows: "In order to give timely notice of a charging lien an attorney should either file a notice of lien or otherwise pursue the lien in the original action. An attorney claiming a charging lien is obligated to notify his clients in some way before the close of the original proceeding that he intend[s] to pursue the charging lien." *Id.* (citations and internal quotations omitted). Thus, the

central proposition of *Scutieri* is that a terminated attorney must file a notice of charging lien while the original proceeding is still ongoing. *Id., see also Richman Greer, et al., v. Chernak*, 991 So. 2d 875, 878 (Fla. 4th DCA 2008) (timely notice of charging lien requires the attorney to file a notice of lien or otherwise pursue the lien in the original action); *Weiland v. Weiland*, 814 So. 2d 1252, 1253 (Fla. 2d DCA 1993).

KGR filed its notice of charging lien in the original proceeding before the Court entered final judgment – the *partial* final judgment implies as much.  Indeed, until recently, several additional post-judgment motions were pending that related to fees and costs (of which KGR was a party to) and they were all filed after KGR's charging lien. *See* [D.E. 591].  While the parties ultimately settled those motions, had the Court ruled on and reduced them to judgment, the result would have been the entry of a second partial amended final judgment – a result which would have mooted this specific issue altogether.  Regardless, the Court has yet to enter "final" judgment and thus KGR filed its charging lien in the original proceeding.  KGR's charging lien is timely. *See Daniel Mones, P.A.*, 486 So. 2d 559; *see also Baker & Hostetler, LLP v. Swearingen*, 998 So. 2d 1158, 1163 (Fla. 5th DCA 2008) (charging lien is timely even after entry of a final judgment because court had yet to divest itself of jurisdiction and it specifically retained jurisdiction to resolve additional pending matters); *Minks v. Polaris Industries, Inc.*, No. 6:05-cv-1894-Orl-31KRS, 2011 WL 3320507, at *2 (M.D.

Fla. Aug. 2, 2011) (same).[11]   Accordingly, all three charging liens are valid and enforceable.

       2.    <u>*RMJS was Counsel of Record When the Contingency Occurred*</u>.

Under Florida law, an attorney employed under a valid contingency fee agreement but discharged without cause before the contingency occurs is entitled to fees based on quantum meruit. *See Rosenberg v. Levin*, 409 So. 2d 1016 (Fla. 1982); *Poletz*, 652 So. 2d at 368-69; *Zaklama*, 906 F.2d at 652-53 (collecting Florida cases). On the other hand, the occurrence of the contingency prior to discharge of the attorney entitles that attorney to his stated fees pursuant to the contingency fee agreement. *See Cooper v. Ford & Sinclair, P.A.*, 888 So. 2d 683, 690 (Fla. 4th DCA 2004); *Zaklama*, 906 F.2d at 653 (collecting Florida cases).  As a result, the moment *when* the contingency occurs is the material, triggering event.

KGR argues that the contingency occurred while it represented Buckley because "a verdict and judgement were entered on behalf of Buckley Towers and the supersedeas bond was filed with the clerk to secure the award" and thus "the potential contingency (award of damages secured by the bond) occurred during KGR's representation[.]" [D.E. 560 at 6-7].  And that, in effect, this case was "'won' while Buckley Towers was represented by KGR." *Id.*  RMJS disagrees, however, arguing that

---

       [11]    Also, the Court's partial amended final judgment reserved jurisdiction to "enter further partial or amended final judgments and orders as needed for all additional unresolved issues." [D.E. 506 at 3].  Not only does this establish that final judgment was not entered, it demonstrates that the Court intended to entertain additional motions.

the contingency occurred "when QBE issued the checks pursuant to this Court's Partial Amended Final Judgment on April 21, 2011." [D.E. 537 at 7].

RMJS is correct. Florida law makes clear that an "attorney's charging lien 'attaches to the *proceeds* of the judgment or settlement or to any *funds recovered* by an attorney for this client." *Scutieri*, 829 F. Supp. at 391 (quoting 4 Fla. Jur. 2d § 161) (citing *Randall v. Archer*, 5 Fla. 438 (1854)) (first emphasis added). And, as *Litman* notes, "although it is said that a charging lien attaches to the judgment, where there are no *proceeds* of the judgment, there is nothing to which a lien may, as a practical matter, attach." *Litman v. Fine, et al.*, 517 So. 2d 88, 91-92 (Fla. 3d DCA 1987) (internal citations omitted); *see also Pasin v. Kroo*, 412 So. 2d 43, 44 (Fla. 3d DCA 1982) (lien may issue only if attorney has in fact recovered proceeds); *Kucera v. Kucera*, 330 So. 2d 38 (Fla. 4th DCA 1976) (noting that money deposited by client with his attorney during pendency of dissolution action would not be proper subject of a charging lien as not being proceeds of a judgment). Therefore, notwithstanding the suggestion that *judgment* triggers the occurrence of the contingency, there are no proceeds to which a charging lien may attach until a judgment is actually paid. *See, e.g., Litman,* 517 So. 2d at 91-92; *see also Restivo v. Anderson & Anderson, P.A.*, 453 So. 2d 1167, 1169-70 (Fla. 4th DCA 1984).

With that in mind, the uncontested facts here are that the Court entered the March 28, 2011 partial amended final judgment (*long after* Buckley terminated KGR), that QBE issued the settlement checks on or before April 21, 2011 and that Buckley

terminated RMJS on or about April 27, 2011.  Because the "proceeds" of the judgement actually came into being on or about April 21, 2011 and because RMJS was counsel of record at that time, RMJS was counsel of record when the contingency occurred.  In fact, determining as a matter of law whether the contingency occurred with payment of proceeds or at the relevant judgement is largely irrelevant because in each instance RMJS was counsel of record.  Thus, regardless of whether the continency occurs at judgment or payment, the continency took place while RMJS was counsel of record.[12]

### 3.  *Whether RMJS was Terminated for Cause is Irrelevant*.

Buckley contends that RMJS was terminated for cause and therefore its entitlement should be reduced accordingly. *See* [D.E. 561-1 at 7].  Buckley asserts, supported by an affidavit from its President Margaret Ann "Peggy" Stoker, that RMJS improperly rejected settlement offers during appeal and failed to explain the potential consequences associated with terminating B&P or KGR and then re-hiring Rosenbaum and his new firms. [D.E. 561-2 at 8-9].  While RMJS rejects these arguments, it specifically contends that this issue is beside the point because, according to RMJS, once the contingency occurs and the attorney establishes his charging lien is valid, that attorney is entitled to the full contingency regardless of termination for cause. [D.E. 562 at 4-5].

---

[12]    Buckley argues that because matters remain pending and the Court entered a partial final judgment only, that the contingency has yet to occur. *See* [D.E 561-1 at 5-7].  However, as other cases have made clear, a partial contingency may trigger an attorney's right to foreclose a charging lien. *See, e.g., Poletz*, 652 So. 2d at 367 (partial settlement gave rise to motion to adjudicate charging lien); *see also Kozich v. Kozich*, 501 So. 2d 1386 (Fla. 4th DCA 1987) (same).

Notably, neither party cites any Florida case that directly answers this precise question.  Rather, Buckley points to cases having dealt with attorneys terminated for cause *before* the contingency occurs and extrapolates that the same rule should apply to terminations for cause *after* the contingency occurs.  RMJS cites the general contract law proposition that the non-breaching party is entitled to the benefit of its bargain. *See, e.g., Brandon, et al., v. MedPartners, Inc.*, 312 F.3d 1349, 1358 (11th Cir. 2002) (non-breaching party is entitled to recover the benefit of its bargain under a contract).  However, a natural extension implied by the conclusion of *Cooper* is that once the contingency is met, the attorney is in fact due his fee under the contingency fee agreement without equivocation. *See Cooper*, 888 So. 2d at 690 (once the object of the contingency fee agreement is secured, "attorneys [are] entitled to rely upon the provisions of the written contingency fee provision to determine the amount of their fee.") (citations omitted).  As such, for our purposes, this "for cause" issue is irrelevant.[13]

## C.     *RMJS's Charging Lien*

Buckley terminated B&P and KGR without cause to follow Rosenbaum from firm to firm, executing new contingency fee agreements along the way.  Ultimately, the contingency occurred while RMJS was attorney of record and, thereafter, all three law firms moved to enforce their charging liens.  RMJS contends that it should receive the

---

[13]     Moreover, resolving this issue would require a fact-finding endeavor that enters the arena of Buckley's at law remedies against RMJS for malpractice and breach of its fiduciary duty, which the Court already decided not to resolve here.

entire 38.5% contingency fee award while B&P and KGR argue, as limited to this issue, that they should receive an amount in quantum meruit allocated from that contingency fee award.  RMJS agrees that B&P and KGR are owed their quantum meruit but that they must be paid by Buckley, not from RMJS's contingency fee award.

The weight of authority in Florida favors RMJS and its position that typically the *client* – not the subsequent attorney – must bear the additional costs associated with its decision to terminate one attorney and hire another.  *See, e.g., Lubell v. Martinez*, 901 So. 2d 951 (Fla. 3d DCA 2005); *Jones & Granger v. Johnson*, 788 So. 2d 381 (Fla. 1st DCA 2001); *Carman v. Guardianship of Potter*, 768 So. 2d 1156 (Fla. 1st DCA 2000); *Afrazeh v. Miami Elevator Co. of America*, 769 So. 2d 399 (Fla. 3d DCA 2000); *Miller v. Jacobs & Goodman, P.A.*, 699 So. 2d 729 (Fla. 5th DCA 1997); *Adams v. Fisher*, 390 So. 2d 1248 (Fla. 1st DCA 1980); *Sohn v. Brockington*, 371 So. 2d 1089 (Fla. 1st DCA 1979); *see also Reed & Steven v. Hip Health Plan of Florida, Inc.*, 81 F. Supp. 2d 1335 (S.D. Fla. 1999) (citing Florida law).

However, the rationale distilled from those cases is as follows:

> Where a client retains counsel under a contingent fee contract, discharges that counsel before trial, without cause, and then retains new counsel under a contingent fee agreement, the client is liable for each counsel's fees, and the first counsel's fees are not to be deducted from the second counsel's fees, absent a provision in the second counsel's contract to the contrary. A client thus may pay fees in excess of the original contingent fee by paying the discharged attorney in quantum meruit and the substituted attorney on a new contingent-fee contract; such double payment should operate as a self-limiting factor on the number of attorneys discharged.

> The rule entitling discharged attorneys hired under a contingent fee contract to quantum meruit for their services ensures the client the right to discharge an attorney at any time with or without cause, while at the same time making a client responsible for his or her actions. A substituted attorney is entitled to the full contingent fee provided for in the contract. A successor attorney who is hired after a client discharges the original attorney is entitled to the full amount of his or her contingent fee, thus a trial court cannot divide the attorney's fee between the discharged attorney and the successor attorney where the successor attorney notified the client that the client may have to pay both attorneys.

4 Fla. Jur. 2d, *Attorneys at Law,* § 463 (citing *Adams* and *Lubell*). As this makes clear, that proposition of Florida law assumes, as did those courts, that the *client* (who indeed has an uninhibited right to discharge its counsel for any reason at any time) was the impetus behind terminating one attorney and retaining another. And for that reason it logically followed that the *client* should shoulder the additional financial burden of its decision. *See Adams*, 390 So. 2d at 1251 ("Such a rule insures the right of a client to discharge an attorney at any time with or without cause, but it also makes the client responsible for *his actions*.") (emphases added); *Sohn*, 371 So. 2d at 1093 (same).

But, when the facts are reversed and the turnover is actually "lawyer-driven" it turns this rule on its head because the client still suffers a penalty simply for re-hiring its original attorney. *See, e.g., State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, No. 97-7014-CV, 2004 WL 5500705, at *30 (S.D. Fla. Oct. 27, 2004) (noting the "truly ironic" position presented by an attorney who attempted to rely on *Adams* when the reason for the discharge "was not client driven, but was instead lawyer driven" and

that such a situation (not unlike ours) presented a "unique and regrettable situation that *Adams* and *Jones* do not contemplate.").

For example, *Adams* typifies the underlying facts which support this rule. There, the client entered into a contingency fee agreement with attorney One who handled various pretrial matters. Then, approximately five months later, the *client* discharged attorney One and hired attorney Two (an entirely new attorney/firm), under a new contingency fee agreement, who thereafter settled the matter out of court. 390 So. 2d at 1249-50. *Adams* reversed the trial court's decision to pay attorney One from attorney Two's contingency fee award because, although a"client has the right to discharge his counsel at any time ... [based on] an implied condition of the contract that the client may terminate at will," this freedom is tempered by a rule that imposes the financial burden of paying attorney One on the client to thus limit any potential abuse of this freedom. *Id.* at 1250-51.

Clearly, those "client-driven" facts were specifically relevant in *Adams*' decision. Indeed, bolstering its conclusion, *Adams* cites to *Sohn*, which states:

> The adoption of a rule limiting an attorney's action exclusively to quantum meruit is unlikely to result in the wholesale *discharge* of attorneys *by clients shopping for the least expensive fees*. The clients who do so *run the risk* of being twice exposed to fees, once, to the *discharged attorney* for the reasonable value of services, which could conceivably be in excess of the contingent fee recovery, and again to the *substituted attorney* on the contract.

*Id.* at 1251 (citing *Sohn*, 371 So. 2d at 1094) (emphasis added). This "shopping for the least expensive" and "run the risk" language clearly elucidates that an underlying

23

concern of *Adams* and *Sohn* was to strike a balance between a client's freedom to terminate its attorney (nefarious or not) with that of two "innocent" attorneys (one who objectively did nothing to warrant termination and another who objectively did nothing to warrant the reduction in his eventual fee). And, in this particular context, the rule makes sense and comports with the underlying purpose and rationale of the cases which gave rise to this rule. *See Sohn,* 371 So. 2d at 1093 (*citing Fracasse v. Brent,* 6 Cal.3d 784 (Cal. 1972), *Martin v. Camp,* 219 N.Y. 170 (N.Y. 1916) and *Salopek v. Schoemann,* 20 Cal.2d 150 (Cal. 1942) (all of which dealt with "client-driven" terminations).

On the other hand, when a client is motivated to terminate its law firm because the attorney handling his claim left that firm, it makes less sense to impose that financial burden on the client. Indeed, the premise that a client is shopping for a better deal vanishes in this context. Instead, a better (and somewhat less paradoxical) approach is to apply the underlying rationale of *Adams* – which is to limit potential abuse – proportionally to both client and attorney to thus temper an attorney's freedom in this context also. For example, by imposing limits on the contingency fee percentage an attorney may charge its re-hiring client in a new fee agreement, requiring unambiguous notice provisions in a subsequent contingency fee agreement that explicitly explain the consequences of retaining new counsel or permitting a court to allocate a single contingency fee between counsel. Otherwise, like here, a client may execute several contingency fee agreements to maintain an attorney-relationship with

a single attorney that ultimately exposes it to attorney fee liability that could reach up to 117% of its gross recovery.

Because the facts here are clearly distinguishable from *Adams* and *Sohn*, the Court initially considered this case to be an appropriate occasion to carve an exception to those cases and fashion a new rule that accounts for the inequities of this situation. The Court intended to allocate RMJS's single contingency fee award between the three law firms based on their proportionate contributions. By doing so, this approach would comport with *Adams* and *Sohn* because it would place the additional cost on the party that created it – in *Adams* it was the client; here it is the attorney.

This alternative approach finds support in several cases outside this jurisdiction that divided a single contingency fee among counsel, rather than imposing the additional quantum meruit cost on the client. *See, e.g., Guess v. Parrott*, 585 S.E.2d 464, 471-72 (N.C. Ct. App. 2003) (applying the "quasi-quantum meruit" approach and dividing the single contingency fee among each contributing attorney); *see also Pumphrey v. Empire Lath & Plaster*, 144 P.3d 813, 816 (Mont. 2006) (same); *Davis v. NBS Trucking, Ltd.*, No. 09-CV-0919S (Sr), 2010 WL 5072139, at *2 (W.D.N.Y. Dec. 7, 2010) (holding that, pursuant to New York law, the discharged attorney in a contingency fee case would be entitled to a fee "based on [its] proportionate share of the work performed on the whole case.") (citing *Lai Ling Cheng v. Modansky Leasing Co., Inc.*, 73 N.Y.2d 454, 458 (N.Y. 1989)).

But, *Jones & Granger v. Johnson*, 788 So. 2d 381 (Fla. 1st DCA 2001), gave the Court pause. *Jones & Granger* grappled with a somewhat analogous situation but to a lesser degree: the client's attorney separated from his law firm and *then* the client terminated the law firm without cause and re-hired the separated attorney under a new contingency fee agreement. *Id.* at 381-82. Thereafter, the separated attorney mediated a settlement and the firm/separated attorney disputed over how to appropriately allocate the attorneys' fee award of $82,963.71. *Id.* In total, the firm expended 18.1 hours and the separated attorney expended 55 hours. *Id.* at 382. Relying on *Sohn* and *Adams*, however, the First District, undeterred by the potential hardship imposed on the client, concluded that "[the firm] has no claim against the contingent fee owed [attorney Two]," *id.* at 383, and furthermore that "[t]he *Adams* court held that it was error to award the fee of the discharged attorney out of the fee recovered by the substituted attorney." *Id.* at 384 (citing *Adams*, 390 So. 2d at 1251).

Thus, while this Court may find this rule inherently flawed, Florida courts apply it universally. But, the rule does have its exceptions. For instance, in *Lubell*, the Third District divided a single contingency fee award between the attorneys after attorney Two agreed to accept a 15% reduction in his contingency fee award. 901 So. 2d at 952-53. Thus, in effect, the client would pay an amount greater than the single contingency fee only if the quantum meruit award exceeded that 15% reduction. Likewise, in *Afrazeh*, the appellate court reversed the trial court's decision and allocated the 40% contingency fee award between the attorneys, with attorney One

26

receiving his quantum meruit from the contingency fee award.  769 So. 2d at 402-03. *Afrazeh* reached this decision based on testimony from the client that the attorneys would split the contingency fee award and because attorney Two admitted to telling his client that the client would receive 60% of the total award. *Id*.  Thus, at least in part, the court rested its decision on a tacit agreement by attorney Two, who would have otherwise received the entire contingency fee award.  In short, the prevailing view in Florida is that a discharged attorney is limited to an award of quantum meruit paid by the client, regardless of who prompted the termination, *unless* the retained attorney agrees to share the contingency fee.

We find that such an agreement exists in this case.  Buckley has clearly stated that it opposes any award greater than the 40% contingency fee agreement it originally executed with B&P, thus implicitly agreeing to the three firms dividing a single contingency fee award. [D.E. 561-1 at 1].  B&P acquiesced to Buckley only paying a single contingency fee.[D.E. 540 at 4; D.E. 557 at 6 n.10].  KGR agrees that the total fees owed by Buckley to all of the law firms should be capped at a single contingency fee.[D.E. 542 at ¶20; D.E. 542-2; D.E. 542-3].  And finally, RMJS tacitly agreed to divide the single contingency fee among all three firms. *See id*.[14]

---

[14]    Al LaSorte, counsel for KGR, responded to an email from John Siracusa, counsel for RMJS, in which LaSorte agreed with Siracusa's position that "the total fees owed by the client to all firms should be capped at the contingency contract rate, with the remaining issue being the apportionment of that amount among the firms involved."  In a subsequent email from Siracusa to LaSorte, Siracusa discussed other portions of the email, but failed to dispute that comment and thus implicitly or tacitly agreed to its effect. [D.E. 542-3]; *see, e.g., Protocol Communications, Inc. v. Andrews*, 991 So. 2d 429, 430 (Fla. 1st DCA 2008) (court concluded tacit agreement sufficient

Each party now maintains that position except RMJS. *See* [D.E. 562 at 5-7]. Not surprisingly, RMJS took the former position while it was still counsel of record for Buckley and thus had an occasion to maintain a copacetic relationship. However, after Buckley terminated RMJS, this changed along with RMJS's position. Instead, RMJS now asserts that it should receive the entire contingency fee, with any quantum meruit award to B&P and KGR paid solely by Buckley. *Id.* Notably, RMJS never resolves this discrepancy or otherwise explains why it decided to alter its position (except for the obvious monetary motivation). Indeed, for context, by taking this latter position, RMJS claims an award equivalent to an hourly rate of $23,052.97 for the 201 hours it devoted to this matter. [D.E. 495 at 49].[15] However, without a sufficient showing for

---

even though the employer did not expressly agree to the designation of the treating doctor as the claimant's independent medical examiner, because the employer was aware of and did not challenge or otherwise contest that status).

[15] While uncommon, courts are charged with determining whether a particular attorney's fee is clearly excess based on a review of the facts. *See, e.g., Sitomer v. First of America Bank-Central*, 667 So. 2d 456, 458 (Fla. 4th DCA 1996) (noting that the claimed fee, which amounted to $2,625 per hour, was excessive); *Trend Coin Co. v. Fuller, Feingold & Mallah, P.A.*, 538 So. 2d 919, 922 (Fla. 3d DCA 1989) (an effective hourly rate of approximately $3,000 per hour is excessive); *Dade County v. Oolite Rock Co.*, 311 So. 3d 699, 705 (Fla. 3d DCA 1975) (concluding that the respective hourly rates of $909 and $993 are excessive); *but see Vilkes v. Comm'r of Social Sec.*, No. 2:03CV687FTM-29DNF, 2007 WL 1498115, at *2 (M.D. Fla. May 14, 2007);*Claypool v. Barnhart,* 294 F. Supp. 2d 829, 833-34 (S.D. W.Va. 2003) (approving contingency fee translating to an award of $1433 per hour); *Brown v. Barnhart,* 270 F. Supp. 2d 769, 772-73 (W.D.Va.2003) (approving contingency fee translating to $977 per hour); and *Coppett v. Barnhart,* 242 F. Supp. 2d 1380, 1385 (S.D. Ga. 2002) (approving a contingency fee translating to an award of $350.49 per hour); *Eakin v. United Technology Corp.*, 998 F. Supp. 1422, 1435 (S.D. Fla. 1998) (noting that the court is unable to find a single case in which a trial court has declared a contingency fee, based on a valid contract, to be excessive); *see also The Florida Bar v. Shankman*, 41 So. 3d 166, 170-72 (Fla. 2010).

the change (or any explanation for that matter), the Court concludes that RMJS's tacit agreement to split the contingency fee award controls.

This conclusion is also compelled because the Court is sitting as a court in equity. "[C]ourts of equity are loath to allow loopholes, technicalities, or *game-playing* to dictate results when those results would violate basic notions of equity and fair play." *Coral Springs Street Systems, Inc. v. City of Sunrise*, 371 F.3d 1320, 1340 (11th Cir. 2004) (emphasis added). "While a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness and conscientiousness on the part of the parties who occupy a defensive position in judicial controversies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies." 2 Pomeroy, *Equity Jurisprudence* § 398, at 93 (5th ed.). As the United States Supreme Court explained long ago: "It is a principle in chancery, that he who asks relief must have acted in good faith. The equitable powers of this court can never be exerted in behalf of one who has acted fraudulently or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make this court the abetter of iniquity." *Bein v. Heath,* 47 U.S. 228, 247 (1848). Or as the Supreme Court later framed the idea, "[c]ourts of equity frequently decline to interfere on behalf of a complainant whose attitude is unconscientious in respect of the matter concerning which it seeks relief." *Nat'l Fire Ins. Co. of Hartford v. Thompson,* 281 U.S. 331, 338 (1930) (citing *Deweese v. Reinhard,* 165 U.S. 386, 390 (1897)). Finally, as one Florida Supreme Court justice put it, "[o]ne of the most elementary and

29

fundamental concepts of equity jurisprudence and a universal rule which affects the entire system of equity jurisprudence is the maxim that 'He who comes into equity must come with clean hands.' This principle is founded upon conscience and good faith." *Ryan v. Ryan,* 277 So.2d 266, 276 (Fla.1973) (Roberts, J., dissenting).

Here, the only material difference between when RMJS took those two positions is that Buckley terminated it in the latter instance. And, without any material difference between the parties, RMJS's actions are seen as motivated by spite or bad faith, as opposed to justice, good faith, uprightness, fairness or any of the other "elementary and fundamental concepts of equity jurisprudence." *Id.* Plainly, RMJS attempts to increase its attorney fee award to the direct detriment of its former client by, in effect, imposing a substantial financial penalty on Buckley for terminating their relationship – an act that countless courts have consistently held to be impermissible at any time for any reason. And, the fact that Buckley may or may not have terminated RMJS without good cause is irrelevant because, in courts of equity, it primarily is the actions by the movant rather than its opponent that concern the court. *See Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (the principle of unclean hands forecloses the possibility of equitable relief to a party who has done wrong in the context of the dispute, regardless of the impropriety of the other party's behavior.)

But, even assuming Buckley indeed wrongly terminated RMJS, the Court finds that imposing a multi-million dollar penalty would be excessive. In that sense, this case is inapposite with *Jones & Granger* – the only analogous *Adams* case – because

the quantum meruit award imposed on the client there was a mere $7,500 in attorney's fees. 788 So. 2d at 382, 385.  Because RMJS fails to provide any explanation for its latter position, fails to cite a case that is comparable in degree to these facts or otherwise demonstrates how the sought result is equitable, the Court concludes that RMJS's latter position is tantamount to unclean hands and rejects it here.

While *Precision Instrument* suggests that unclean hands may "close the doors of a court of equity to one tainted with inequitableness," 324 U.S. at 814, the Court exercises its discretion and finds that a more equitable solution is to hold RMJS to its tacit agreement. *See Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245-46 (1933) (courts of equity "apply the maxim, not by way of punishment for extraneous transgressions, but upon consideration that make for the advancement of right and justice.  They are not bound by any formula or retrained by any limitation that tends to trammel the free and just exercise of discretion.").

Sitting in equity, the Court concludes that each law firm and Buckley agreed to divide a single contingency fee among the three law firms.  RMJS  should thus receive its 38.5% contingency fee award from the partial amended final judgment, less the *Poletz* quantum meruit of B&P and KGR, with the remainder to Buckley.  Accordingly, the Court recommends that RMJS should receive an award of $3,057,687.88.

### D. *B&P and KGR Recover in Quantum Meruit*

Having resolved that prior counsel agree to share in a single contingency fee award, the next inquiry turns to quantifying an award for B&P and KGR.  As noted above, *Poletz* provides "the proper criteria for determining the quantum meruit

31

recovery of an attorney discharged without cause prior to resolution of the client's case." 652 So. 2d at 367.  *Poletz* elaborated that a court should apply this modified quantum meruit analysis by considering the "totality of the circumstances of the professional relationship . . . to ensure that the award is fair to both the attorney and client." *Id.* at 368-69.

To begin, the Court considers the *Rowe* conventional loadstar analysis by calculating the reasonable fees by a reasonable hourly rate. *Fla. Patient's Comp. Fund v. Rowe*, 472 So. 2d 1145 (Fla.1985).  These amounts were previously determined in the Court's Report and Recommendation on Buckley's Renewed Motion for Attorney's Fees as $681,063 and $894,897 for B&P and KGR, respectively. [D.E. 458 at 4].[16]  From this baseline, the Court evaluates each firm's relationship with Buckley to determine whether these amounts fail to compensate them for the actual value of the services provided to Buckley.  B&P and KGR both argue that the "totality of the professional relationship" warrants increasing their quantum meruit awards.  As explained below, the Court finds that *Poletz* counsels otherwise.

      1.    <u>B&P</u>.

B&P lists several factors that it contends should positively affect its quantum meruit award, including that: 1) B&P was responsible for nearly 50% of the record activity, including a majority of pre-trial work; 2) the result obtained (presumably due in part to B&P's pre-trial work) was substantial; 3) RMJS only worked on the appeal;

---

[16]    The District Court adopted this Report and Recommendation in its entirety. [D.E. 476].

4) RMJS purportedly failed to notify Buckley about the consequences of terminating its prior counsel; 5) RMJS's fee-sharing agreements with B&P; 6) Rosenbaum's fiduciary obligation to B&P; 7) B&P's three-decade long relationship with Buckley juxtaposed with Rosenbaum's lack of any prior relationship with Buckley; and 8) the reason Buckley terminated B&P, which was to follow Rosenbaum and not B&P's poor performance. [D.E. 557 at 11-12].

These factors, however, are largely irrelevant or unpersuasive to our quantum meruit inquiry. B&P points to several factors relating to Rosenbaum or RMJS as a basis to increase B&P's quantum meruit award. But, *Rosenberg* makes clear that the purpose of awarding quantum meruit is to compensate a discharged attorney for the actual value of the services it provided the *client* before its termination. And thus the inquiry is focused on that specific attorney-client relationship with an eye to "fairness" that seeks to return to the terminated attorney the unpaid benefit inured to the client as a result of the termination. 409 So. 2d at 1018-21; *see also Jay v. Tranzenfeld*, 952 So. 2d 635, 637 (Fla. 4th DCA 2007) ("The rule of *Rosenberg v. Levin* applies to fees due from *the client* to the attorney when counsel has withdrawn before the occurrence of the contingency. By the express language of *Rosenberg v. Levin* the quantum meruit rule fixes *the client's* obligation only when counsel has been discharged without cause before the contingency has occurred."). Hence, the factors relating to Rosenbaum or RMJS are inapplicable to B&P's quantum meruit award. This conclusion makes perfect sense; to find otherwise would make a client financially responsible for the

actions or inactions of its third-party retained counsel, which is entirely unrelated to the very essence of the "quantum meruit" remedy. *See, e.g.,* 66 Am. Jur. 2d, *Restitution and Implied Contracts*, § 37 ("A quantum meruit claim is generally based on a promise implied by the law that a person will pay reasonable compensation for valuable services or materials provided at his or her request, and accordingly, one rendering services or furnishing materials at another's request ordinarily may recover from the other the value thereof."); *see also* 17 Fla. Jur. 2d, *Damages*, § 18 (same).

With that in mind, the remaining relevant factors are that B&P was purportedly responsible for a majority of the beneficial pre-trial work in this matter; that Buckley discharged B&P through no fault of B&P; that B&P and Buckley agreed to a 40% contingency award; and the benefit conferred on Buckley was substantial.

First, B&P operated under a contingency agreement with Buckley for *less than four months* and, beforehand, Buckley paid B&P an hourly rate.  Through this prism, B&P's claim of handling the majority of the pre-trial work is less compelling and ultimately cuts against increasing B&P's quantum meruit award.

Second, while B&P was indeed faultless in its termination, this is a neutral factor because, under the evolution of contingency fee agreements and the unique character of an attorney-client relationship, a client is free to terminate its attorney for any reason at any time without penalization.  Conversely, however, if Buckley had terminated B&P for cause, this would warrant a *reduction* in the quantum meruit award. *See, e.g., Kushner v. Engelberg, Cantor & Leone, P.A.,* 699 So. 2d 850, 851 (Fla.

4th DCA 1997).  Thus, this factor also counsels against increasing the quantum meruit award.

Finally, on consideration of all the relevant factors, the Court finds that the "benefits conferred" factor is B&P's most persuasive argument.  The question turns on whether an award of $681,063 fails to appreciate the totality of the circumstances of the professional relationship and provides an unpaid benefit to Buckley.  Relevant factors implicit to this determination are the recovery sought and the skill demanded. *Rosenberg*, 409 So. 2d at 1022.  However, as this Court previously noted, this matter was not one of exceeding difficulty that required greater skill:

> [T]his Court observes nothing extraordinarily complex or difficult about the litigation.  Buckley fails to make clear how the complexities it encountered were more difficult than any hurricane insurance dispute previously litigated. For instance, QBE asserts persuasively that its affirmative defenses were not complex, risky, or novel since they all arise under the insurance policy language.  Moreover, although Buckley argues that the case required an inordinate amount of research and legal memoranda, as well as much time, labor, and expense in examining experts and witnesses, this contention speaks more to the hours expended on the litigation, not to the relative complexity of the dispute.
>
> Also, based on the little evidence provided by Buckley, this Court finds it difficult to observe anything so complex or difficult about the dispute as compared with other cases previously handled by Buckley's counsel against QBE's. Indeed, Buckley concedes that no other counsel in Florida has defeated QBE in a hurricane insurance dispute besides Rosenbaum himself.
>
> Likewise, this Court does not find any materially significant novel issues that would entitle Buckley to a multiplier.  In particular, although the issues involving good faith and fair

35

dealing and the deductible were certified to the Florida Supreme Court in *Chalfonte*, they were not certified until after the trial in this case. As a result, both claims cannot be novel issues if at the time Buckley argued them at trial, it was litigating an argument it was more than familiar with. Further, even though the court acknowledges that the "prevention doctrine" argument may have been a novel issue during trial, it is not enough to supplant the fact that, overall, Buckley has failed to prove why this case was any different from its other complex property insurance litigation cases. In other words, the claim may have been hotly contested . . .but it was still primarily a contractual dispute over insurance coverage.

Finally, although a risk of nonpayment was established, Buckley argues that it was able to mitigate that risk by remaining indebted to B&P for legal services rendered before the contingency agreement was entered into. Clearly, this contention only gives weight to the fact that Buckley may have been able to pay a portion of the fees, a fact that does not support the argument for a multiplier.

In sum, this case was clearly difficult, time consuming and hard fought. Experienced and well financed counsel were clearly necessary for its ultimate successful outcome. But that is why a substantial fee should be awarded under the normal lodestar calculation. To award a multiplier, the Court would have to find evidence in the record that would show that this case was far outside the normal sphere of a complex insurance case, for which only a multiplier was necessary to obtain very competent counsel. But Buckley's counsel failed to prove that this case was riskier and more complex than previous hurricane insurance disputes it had litigated. Further, it conceded it was able to mitigate the risk of nonpayment.

Buckley thus offered little or no evidence that securing counsel would have been particularly troublesome in the relevant market without a multiplier. In our view, that lack of evidence is fatal to the claim for a multiplier. As such, Buckley has not met its burden to provide substantial competent evidence to justify the utilization of a multiplier.

[D.E. 458 at 9-11 (quotations and citations omitted)]. These conclusions apply with equal force here because B&P's position is aligned with many of the same arguments raised by Buckley in that motion. At bottom, based on the foregoing and evaluating the totality of the professional relationship, the Court finds no good cause to award B&P quantum meruit greater than $681,063.

B&P forgets that this substantial fee award provides compensation for a relatively short period of time and, because of its early termination, Buckley's ultimate recovery is only tenuously attributable to those pre-trial services. *Cf. Miami Battery Mfg. Co v. Boston Old Company Ins. Co.*, 2000 WL 35288123, at *4-5 (S.D. Fla. July 27, 2000) (highlighting the difference between the *Rowe* lodestar and the *Poletz* "totality" analysis to highlight the inequities caused when a client terminates his attorney on the courthouse steps just before settlement – largely antipodal to the facts relevant to B&P). Indeed, the Court would be hard-pressed to quantify an appropriate, non-arbitrary, quantum meruit award based on this limited criteria, especially where B&P has failed to cite (as it clearly concedes) a single case that explicitly provides the relief it seeks here. *See* [D.E. 557 at 7-12, n.11]. Accordingly, the Court concludes that a quantum meruit award of $681,063 takes into consideration the totality of the relationship and fairly compensates B&P for the *actual* value of its services.[17]

_____

[17]    This conclusion also comports with B&P's position that Buckley should be obligated to pay a "single contingent fee" only. [D.E. 557 at 6 n.10; D.E. 540 at 4].

2.    _KGR_.

At first blush, KGR seems to raise a more difficult question.  In the end, the Court ultimately reaches the same conclusion and recommends a quantum meruit award totaling $894,897, based on the Court's previous attorney fee analysis. [D.E. 458].  As we must, the Court turns to the _Poletz_ factors to evaluate KGR's quantum meruit award.  Unlike B&P, the record is undisputed that KGR handled the vast majority of the substantive work in this matter on contingency including six months of pretrial, the trial, and briefing on the subsequent appeal, which totaled approximately 20 months.  Thus, on direct comparison, KGR contributed more than five times that of B&P, entirely on contingency, and KGR successfully obtained a $24 million jury verdict.[18]  Granted, the negotiated contingency fee amount was less at 38.5% but, all things being equal, this is a relatively minor difference.  Altogether, these facts tend to suggest that a quantum meruit award based on the product of a reasonable hour and a reasonable fee produces an award that is _less_ than the _actual_ value of the services conferred on Buckley.  In other words, that KGR should receive a quantum meruit award _greater_ than that awarded as a reasonable attorney's fee.

Yet, the Court retracts from that conclusion for several reasons.  First, KGR has expressly agreed that Buckley should only be obligated to pay a single contingency fee award and thus providing KGR a greater quantum meruit award would violate KGR's express wishes.  _See_ [D.E. 542 at ¶20; D.E. 542-2,3].  Second, like B&P, many of the

_____

[18]    Notably, the difference in hours actually billed by B&P and KGR is less pronounced at 2,501 and 3,628.7, respectively. [D.E. 443-3].

reasons that KGR advances to increase its award are directly related to certain purported "bad acts" by RMJS, rather than factors relevant to Buckley or the uncompensated benefit conferred on Buckley.[19]  As explained above, the purpose of an equitable quantum meruit award is to ensure a fair result is reached between an attorney and its *client* and thus factors relative to RMJS are effectively beside the point. *See Rosenberg*, 409 So. 2d at 1018-21.

After considering the totality of the circumstances surrounding KGR's representation of Buckley, including the factors in Rule 4-1.5(b) of the Rules Regulating the Florida Bar, which were largely discussed in the Court's Report and Recommendation on the Renewed Motion for Fees, the Court concludes that the reasonable and *actual* value of KGR's services is $894,897.  This substantial award clearly accounts for the length of the attorney-client relationship, the risk of non-recovery, and the requisite skills necessary to bring about a result.  All of these factors support a finding that this quantum meruit award is appropriate, but need not be increased.  Moreover, and like B&P, the Court's conclusion is bolstered by the fact that KGR is unable to cite a single analogous case that provides the specific relief it now seeks from this Court.[D.E. 569 at 4].[20]

---

[19]      Indeed, for the sake of brevity, KGR specifically adopted B&P's argument for reallocating the contingency fee among the various law firms. *See* [D.E. 569 at 4].

[20]      As noted earlier, RMJS asserts that KGR's award should be reduced because it was terminated for cause.  As a preliminary matter, RMJS is in no position to make such an assertion as it neither represents Buckley nor reflects Buckley's position.  But, even assuming Buckley did terminate KGR for cause, as RMJS claims, Buckley's affidavit to the contrary establishes that Buckley suffered no damage and,

Generally speaking, the Court reaches this conclusion on these quantum meruit awards in part because we declined to exercise our supplemental jurisdiction to resolve the various state law claims between the law firms. These matters, as noted above, are beyond the typical scope of an equitable resolution of charging liens. Moreover, to have resolved these issues here or to have considered them in context of the charging liens – aside from being, in this Court's opinion, inappropriate – would have resulted in arbitrary awards that likewise would have left the parties unsatisfied. Further still, the Court recognizes that the parties may argue (or have already starting arguing) some of these issues in state court on their at law claims. Thus, to the extent the Court had altered the awards based on those factors relating to RMJS, the Court suspects that they would have simply resulted in set-offs in the state claims. A result that would exemplify a waste of judicial resources.

### IV. CONCLUSION

In light of the foregoing, the Court recommends that the pending motions should be resolved as follows:

1.      Rosenbaum Mollengarden Janssen & Siracusa, PLLC's Motion to Enforce Charging Lien [D.E. 537] is **Granted in Part and Denied in Part**. Sitting in equity, the Court recommends that Rosenbaum Mollengarden Janssen & Siracusa, PLLC should recover $3,057,686.86 from the Court's Registry, which amounts to 38.5%

---

therefore, the Court finds no basis with which to reduce RMJS's award. [D.E. 574 at 4].

contingency fee award of the Partial Amended Final Judgment of $12,035,449.00, less the quantum meruit awards for B&P and KGR.

2.     Katzman Garfinkel Rosenbaum, LLP's Motion to Enforce Charging Lien [D.E. 569] is **Granted in Part and Denied in Part**. The Court declines to exercise supplemental jurisdiction to resolve any of KGR's purported legal claims relating to attorney's fees, but fully adjudicates KGR's equitable charging lien. Sitting in equity, the Court recommends that Katzman Garfinkel Rosenbaum, LLP should recover $894,897.00 from the Court's Registry, which amounts to its quantum meruit award apportioned from RMJS's single contingency fee award of 38.5% of the Partial Amended Final Judgment. KGR's request for an evidentiary hearing is denied. [D.E. 569].

3.     Becker & Poliakoff, P.A.'s Motion to Enforce Charging Lien [D.E. 508, 525] is **Granted in Part and Denied in Part**. The Court declines to exercise its supplemental jurisdiction to resolve any of B&P's purported legal claims relating to attorney's fees, but fully adjudicates B&P's equitable charging lien. Sitting in equity, the Court recommends that Becker & Poliakoff, P.A. should recover $681,063.00 from the Court's Registry, which amounts to its quantum meruit award apportioned from RMJS's single contingency fee award of 38.5% of the Partial Amended Final Judgment.

4.    The Court recommends that the $1,226,480.54 remaining in the Court's Registry should be released to Buckley Towers.[21] Notably, the Court expressly declines to exercise its supplemental jurisdiction to resolve any of the legal claims that Buckley Towers purports to have against any of its prior counsel.

Pursuant to Local Magistrate Rule 4(b), the parties have until March 12th, 2012 to serve and file written objections, if any, with the Honorable Richard W. Goldberg, Senior United States District Judge.   Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein, if any.   *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers, at Miami, Florida this 22nd day of February, 2012.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge

---

[21]    The Court previously released $288,000 from the Court's Registry. [D.E. 590].

42